All right, our fifth case for this morning is United States v. Ferguson. Mr. Stiller. Good morning, and may it please the Court. Grover Ferguson asked this Court to award him a new sentencing hearing, and he proposes two distinct roads to that result. The first is a challenge to his 50-year term of imprisonment, as being so procedurally and substantively unreasonable that it might even constitute a violation of the Eighth Amendment. The second of his two claims attacks the broader sentencing process as defective, for the fact that the district court divorced the fashioning of any supervised release conditions from the imposition of the term of imprisonment. Didn't you go along with that? Pardon me? Didn't you go along with that procedure? Did you raise any objection to it? It might be said that there was no affirmative objection, but I think it would be an overstatement to say that we went along with things. Can you think of any case in which the process of putting the number of years of supervised release and otherwise leaving it completely blank was an acceptable way to come up with a final, appealable criminal judgment? We've been going back and forth about supervised release, and there's a school of thought that you shouldn't even start talking about it until somebody's about to be released from prison and so on, but the assumption behind certainly our Thompson, Kappus, et cetera line of cases has been that A, supervised release terms and conditions need to be pronounced along with the rest of the sentence because, B, there is some interrelationship between the term of years and the stringency of the supervised release conditions. I was very surprised to see this procedure. Your Honor, I've been a federal defender for 21 years now, and I'm in uncharted territory. So in other words, you haven't seen it before either. No, but just yesterday, and I think either this morning or today, we will be filing a 28-J letter with regard to yesterday's opinion in United States v. Orlando. There, the district court was sentencing an offense for which a term of supervised release had to be imposed by statute. Mandatory. Yes. Yeah, sure. The district court imposed the term of imprisonment and put off for some later day both the imposition of a term itself and the imposition of any conditions to include the statutorily mandatory conditions. It might be dicta, but Orlando certainly said that the end result of that sentencing process was a defective sentence. So going back to Your Honor's question, which I think touched on appellate jurisdiction, we came out of Judge Randa's courtroom in December with a defective sentence from which we took the appeal, and that's what brings us here today. Yeah, it's troublesome. I know you've talked a lot about the juvenile stuff, but there's also, I suppose, the argument you're making under Gall that if you're going to go above the guidelines by 32 years, you need to explain why. Yes. Judge, I think we're unapologetic in staking out the following position. We believe that the 50-year sentence may have violated the Eighth Amendment. We believe that the failure to account for the reasoning and rationale of the Eighth Amendment cases under 3553A rendered the sentence procedurally and substantively unreasonable. But we additionally believe, quite frankly, Your Honors, that even if Mr. Ferguson had committed this very same terrible crime at age 32, the district court's explanation for how he got from guidelines of 17 or 18 years to a sentence of 50 years was inadequate under Gall. So the government's brief begins with a point that I think is hard to disagree with, which is that the fact that Mr. Ferguson isn't in prison on a first-degree murder conviction is luck, as far as I can tell, given the way he shot this poor woman. So isn't that kind of an obvious reason to give somebody a really long sentence? Judge, that the government's factual point has validity actually points to a problem with the sentence. Under 2B3.1, which is the guideline applicable to carjackings, if the driver of the vehicle had tragically been killed, 2B3.1 provides for a cross-reference to the murder guideline. If that murder guideline had applied, the offense level, less acceptance of responsibility, plus Mr. Ferguson's Category 2 criminal history, plus 10 consecutive years for the 924C, would have produced a sentence of less than 50 years. So in other words, the sentence that Mr. Ferguson received as a juvenile for not killing someone, fortuitously or otherwise, is a sentence greater than an adult would have received had the woman tragically been killed. Do you happen to remember how much less? Going through all of that since you were making me curious. Judge, I don't want to speak loosely. I recall it coming out to something like 520 or 540 months, whereas Mr. Ferguson currently serves a sentence of 600 months. Okay. I mean, that's fine. So on the juvenile point, the Supreme Court has certainly been saying things about this, but if he's going to be out at the age of 68, I don't know why that makes this a de facto life sentence. It seems to me you're asking for an expansion into just really long sentences for people who are juveniles. That might be a fair characterization, but allow me to explain. It has to be long to an extent. Because what is long? 20 years is long, 25 years is long, 32 years is long. I think the state courts that have acted, that we've cited, and I understand law goes the other way as well, the state courts that have acted in the aftermath of, in particular, Miller and Montgomery, have sort of taken the approach that for a term of years sentence, the Eighth Amendment comes into play when the expiration of the existing sentence would result in the presumably rehabilitated juvenile returning to the community with no valuable life of liberty left in which to demonstrate his rehabilitated character. I suggest, Judge, that when we talk about banishing a man justifiably at age 17, a boy at age 17, and keeping him in prison to a projected release date when he's 67, this is not to say that age 68 life has no value. I'm glad to hear that. I'm just looking at those portraits on the back wall. Yes, but the very things that the rest of us might look forward to at age 67 and 68, time with grandchildren, winters in warm weather, you're looking back on a fond career, a 50th wedding anniversary. If you've been gone since you were 17, that doesn't exist, and quite frankly you flirt with the Shawshank Redemption theory. At 67, Grover Ferguson might actually prefer institutionalization than the challenges that the community would present his presumably rehabilitated self. Mr. Stiller, I confess I had understood your brief to be arguing not that the sentence might violate the Eighth Amendment, but that it does, and I have a couple of questions about that. One, you were critical of the argument that a court in evaluating that de facto life sentence question should take into account the availability of good time credits. Correct. Since the whole premise of this line of cases is life without parole, I don't understand why we wouldn't take into account actual entitled, certainly earnable credits in making that calculation. And I guess my second question is, where do you think the line lies between a de facto life sentence and one that's permitted under the Miller-Montgomery line? All right. Trying to take those questions in their order. I do see the parallel that Your Honor is drawing between parole and good time. I think the difference is that parole, when it's available, presents the possibility, and even to some extent a conditional entitlement, to a much more dramatic reduction. Good time, we're playing around the margins to the tune of 12 percent or something like that. In a sentence this long, that's a long time. And it may be the difference between being above and below life expectancy. I mean, you're talking about math here, and if you get a 15 percent discount or 12 percent, depending on BOP policies. I think things get challenging, and I realize I'm burning up my time. When we sort of start substituting an actuarial table for the good old-fashioned sentencing table, I look at this court's decision in McKinley v. Butler where a term of years, 100 years, the Eighth Amendment was deemed to apply to that. And, of course, we all understand that Mr. McKinley wasn't going to live until 116 years. So it was life by numbers rather than life by letters. But I think it's an interesting question. If the sentence for McKinley had been 75 years. I'm asking you the question. Please help us. You're arguing 50 years is an Eighth Amendment violation. Yes. Would 40 be? I question whether the Eighth Amendment would apply as cruel and unusual to a 40-year sentence. Why? What's the difference? The distinction being that opportunity for a meaningful life of liberty upon rehabilitation. So life expectancy minus, what, 5 years, 10 years? To come out, was the question 40 years, Judge? The question was 40 years. These aren't lines for me to draw, and I'm not sure who they are to draw, but 57 and 67 are different. You are asking us to draw them, right? So I'm asking for help. I'll answer it one way or the other if we have to. Judge, perhaps I might draw the line at the age of retirement, at the age of Social Security entitlement. Those are social barometers that sort of separate a life that's full, rich, vibrant, and active from one that is tending towards its twilight. That's moving up. Do you think, if I could just ask, this is a fairly weighty matter, I frankly think, but do you think the court could consider, in your mitigation arguments, the difference between a 13-year-old and a 17-year-old? I think not, Judge, because the science suggests, as interpreted by the Supreme Court, that both the 17-year-old and the 13-year-old have underdeveloped brains. Within its discretion, do you think the court could draw a line between somebody who's already shown, for example, the kind of criminal record that Mr. Ferguson had accumulated before he shot this poor woman and a 13-year-old who had no prior episodes? Judge, I think that in either event, the offense behavior plus whatever criminal history speaks to the idea that the child is dangerous so long as his mind is underdeveloped, and that makes the 13-year-old and the 17-year-old sort of one and the same for purposes of the Supreme Court's analysis. Would you agree that there are some pretty good reasons here for an above-guideline sentence? Let me just suggest some of them to you. The guidelines here are awfully arbitrary. The six levels, for example, that were imposed for permanent injury would also apply to a permanent crippling of a finger joint, right, as well as to rendering this woman blind in one eye and effectively putting her— well, you know better than I how serious her injuries were. And we've got no real account for the seriousness of the effect on her life. And the 10 years on the 924C is the guideline range no matter what. If he fires into the air to scare somebody, it's a 10-year guideline, and it's a 10-year guideline if he puts three bullets at point-blank range into her head, right? So the way the guidelines calculate this doesn't capture, I would suggest, a lot of what was going on here. Judge, I hope we were affirmative in our reply brief, that it's not our perspective that Grover Ferguson had an expectation, much less a right of a sentence of 15 years or 20 years or 18 years. I'm sensitive to everything that Your Honor has said. But in terms of the Gall-Rita explanation for the dramatic upward variance, those six levels become kind of a measuring stick. In other words, the Sentencing Commission has said that permanent or life-threatening injury of any sort gets you six levels. Those six levels applied to Grover Ferguson's calculus amounts to a difference of three or four years. So I think a proper explanation of how the victim's more serious wounds and her mental and emotional suffering might factor into things is that, okay, if presumptively a permanent or life-threatening injury costs the defendant three or four years, moving that out for whatever aggravation accompanies this victim's injuries. That's the kind of explanation you're looking for. Exactly. All right. Thank you very much, Mr. Stiller. Mr. Proctor. So, Mr. Proctor, before you delve into the merits, I would like you to offer your thoughts on the way the district court bifurcated the supervised release part of this judgment, since I'm having a lot of trouble with that. Certainly, Your Honor. May it please the Court. This is a unique situation. But it won't be unique if this is okay, because a lot of district judges would be delighted to put off supervised release for years, if not months. And this is not something that's done within, say, the 14 days that Rule 35 gives you to correct judgments. It's just sort of this random, out-there time. So I'm very concerned about the precedent that this method of proceeding would create. Certainly, Your Honor. And to give context to where we end up in this particular case, the judge had handed down a 50-year sentence, a custodial sentence. So what? It could have been 100 years. It could have been a life sentence. You know, again, putting to one side explanation. But it's the process of saying, here is your term of years, long, short, or in between. And I'm going to enter this as a judgment. Well, actually, he also said it's going to be five years of supervised release. So he puts the number of years, but he doesn't say a word about the conditions of supervised release. And I'm sure you can probably recite them in your sleep, you know, that our decisions in Thompson and Kappus and this whole line of cases, we're the only circuit in the country that's doing this, as a matter of fact. But we've been trying to recognize that supervised release is an integral part of the sentence. So how can this be a proper way of proceeding? Certainly, Your Honor. Here, the district judge said when he handed down, he said, five years of supervised release. I want the parties to think about what conditions are appropriate. So don't enter the final judgment. If the parties want to think and confer, you can reconvene in a week or ten days or whatever. Tomorrow, give them overnight. There's nothing wrong with having the parties sit there and confer. The problem is entering the judgment. Your Honor, yes, and I believe that the court wanted Mr. Ferguson to have the opportunity to challenge his custodial portion of this sentence. The court can't override jurisdictional limitations on appellate jurisdiction. Maybe Mr. Ferguson would have liked to have done a lot of things, you know, but we have to comply with the structuring rules for the way these cases go forward. Certainly, Your Honor. And in this case, there was, he asked that the government respond in writing. He was going to issue a judgment. The government responded in writing to the objections to supervised release conditions that had been filed by the appellant, and then the appellant filed a response, and then the judge issued a judgment. The judgment specifically said supervised release conditions will be addressed in an amended judgment. That's the problem. That is precisely the problem. This obviously was a case that got a lot of public attention. It was a very emotional sentencing hearing. I'm just wondering, was there a perceived pressure to go ahead with the custodial part while the victim was present, for example, and her neighbor, the niece, was also present? She was young, yeah. I'm just wondering if that might account for the pretty unusual procedure. The procedure caught me by surprise, Your Honor. I anticipated that we would address it at the sentencing hearing. We didn't. I think that the judge simply wanted us to file something in writing saying, in light of this 50-year sentence and in light of cases such as Siegel, that obstruct against imposing a litany of conditions. There were 17 proposed in the PSR. Give it some more thought, and I'm going to hold another hearing if we need to in order to address these conditions. It might serve us right if we got two appeals in every criminal case, out of these supervised release cases, but I'm not sure that given I had always understood the custodial and the prison part of the sentence and the supervised release to be linked in such a way that I'm also concerned about the separation. Maybe we should also talk about the length. Yeah, we can talk about the length. My biggest concern about the length is the lack of an explanation for going from an 18-year guideline sentence, it's my understanding what the guidelines would have put as the cap, 32 years out to a 50-year sentence. And I'm not at all saying that it wouldn't have been possible to justify. There are many things that could have been said, but not only did the judge not do that, the judge, as he has occasionally done before, was talking about things that were not relevant, and so it just didn't give us any window into his thought, why wasn't 40 years enough instead of 50? Why this much above? Your Honor, the transcript and the statement of reasons will provide the… I have read every word of it. You can see my highlighted version in here in my brief. It's not helping me. That's the problem. In my review of it, Your Honor, the district court spent a good half an hour addressing this particular case, going methodically through the 3553A factors. But not in any way. Well, I mean, we can disagree then, I guess, about the relevance. You can spend a half an hour, but if you're talking about the use of child soldiers in Vietnam and part of that half hour, and if you're talking about the neighborhood that your girlfriend used to live in and part of that half hour, and you're just saying over and over again, you're evil, vengeance is mine, sayeth the Lord, we're all from a Judeo-Christian background, you're not explaining to me why 50 years, why not 40, why not 30, why not 60? I mean, he could have done a lot of things. Certainly, Your Honor, and I'll try to address each one of those points. With regard to the length of the sentence, the court specifically stated that the gruesomeness, the terribleness of this crime, the destruction of a life by Mr. Ferguson, is in part what drove the high range here. There was, as Your Honor noted earlier, this was essentially almost a murder, but for the... And as Mr. Stiller points out, it's still a higher sentence than it would have been under the guidelines. We don't even get him... If he had, for example, said, this looks so much like a murder to me that I'm just going to do these calculations on a what-if basis and see where we would come. Oh, I see we come out with 47 years or something, so I'm going to round it up to 50 years, and I think that's just... I would have felt as though there was some hint as to where he came from this, but we're not supposed to sit there and guess. And I'm not sure that the court is necessarily required to tie its specific sentence to the guidelines so long as it goes through the 3553... The Supreme Court said in Gall the further the deviation from the guideline range, the more help you need to give us in terms of the justification for that. So that's the Supreme Court in Gall. It's not that you can't do it, but you have to go through the process. He doesn't at all go through that process. I have to disagree, Your Honour. I believe that the judge rested his sentence on the 3553A factors, which is what he is required to do... But the same discussion of 3553A would have supported 30 years, 40 years, 50 years, or 60 years. We don't have any sense, and that's a lot of difference in time. It is a lot of difference in time, Your Honour, but I'm not sure that it's... We can go ahead and require district judges to say, Well, I'm not going to sentence you to 30 years because of this. I'm not going to sentence you to 40 years... But that's exactly... And Pew, lest you wondered, now that the guidelines are advisory, Pew tells us that they're still an extremely important anchor for the sentence. The U.S. Attorney's offices, on the whole and by and large, have liked that fact, and they've liked the fact that this court at least gives sentences of presumption of reasonableness on appellate review if it's a within-guidelines sentence. But this is not helpful. Your Honour, I guess I have to rely back on the nature of the circumstances and the district judge going through this crime, the defendant's history and background... It's a very, very difficult case to sentence. For anybody, you all obviously put a lot of thought into your recommendation for a guideline sentence. Above-guideline sentence. Above-guideline. I thought you were at 20 years, sorry. Yes, Your Honour, it was above-guidelines. A little above the guidelines, sorry, yes. This may or may not be relevant, but I have to note a sad irony here about the way juveniles are treated in federal constitutional law. That for First Amendment purposes, we treat a 17-year-old or a 10-year-old who wants to play a first-person shooter video game with all of that graphic violence as an adult. Full rights, unimpeded by parental or state controls. But when that young man gets outside the video game, grabs a real gun, and shoots a real person, then we treat him like a child. It's a tension, it's not a question, but I'm just going to note that tension within the federal constitutional law. I see my time is up. You can give us a concluding thought, since I think I'm going to give Mr. Stiller one more minute too. Certainly, Your Honor. I wanted to briefly just comment on some of your points regarding what the district judge mentioned during the sentencing hearing. He did mention child soldiers in Vietnam. As I argue in my brief, I believe that the court was focused on addressing the complexities of trying to address youth and whether or not that becomes an excuse for certain conduct or not. And then he did mention his old neighborhood, but I believe that the judge was trying to reach the defendant and telling him, I know this area, and people should not be afraid to walk up to their car because they're going to be shot in the face. He did mention Judeo-Christian ethics, but that was raised by the defendant in his sentencing remarks. So that was a continuation that was building on those remarks. Judge Hamilton, very briefly, I wanted to talk about the Eighth Amendment. I do believe that good time credits need to be taken into consideration if we do get to an Eighth Amendment-type issue here because under Graham, the question is whether or not there is a meaningful opportunity for release. And in a life sentence without possibility of parole, that's where they came down. Here, good time credits, he would get out, according to the Bureau of Prisons, around 61 years old. And this court has dealt with that a little bit previously in matters concerning whether or not there was a jury finding, a jury had to direct a life sentence before a judge could. This court has, in some questions, wrestled with how best to calculate that. Unless there's any further questions, I'm happy to rest on my break. All right. Thank you very much. And as I said, if you want a minute, Mr. Stiller, I'll give it to you. Thank you, Your Honor. Responsive to Judge Wood's thoughts in particular about this explanation could have supported 30, 40, 50, or 60 years, I think more precision was necessary to comport with the parsimony clause. In other words, the judge's ultimate task was to fashion a sentence sufficient but no greater than necessary. As to Judge Randa's frequent reference to youth and it not being an excuse and that we don't cut the child soldier any slack, we don't know from afar what was actually in Judge Randa's head or in his heart. But I think the most reasonable reading of what he was getting at, he was disagreeing with what the Supreme Court has said, that children are different for purposes of sentencing because they have lesser moral culpability. So ultimately, I think Judge Randa's view of youth was distinctly contrary from the Supreme Court's. Thank you. All right. Thank you very much. We will take the case under advisement.